694 So.2d 1178 (1997)
Acy JACKSON, Jr.,
v.
SAVANT INSURANCE COMPANY and Contract Labor, Inc.
No. 96 CA 1424.
Court of Appeal of Louisiana, First Circuit.
May 9, 1997.
*1179 Ralph Brewer, Baton Rouge, for PlaintiffAppellee Acy Jackson, Jr.
Michael C. Clegg, Baton Rouge, for DefendantAppellant Heck Industries, Inc.
Before LOTTINGER, C.J., and FOIL and FOGG, JJ.
FOGG, Judge.
The defendants appeal a ruling of the workers' compensation hearing officer awarding the claimant total temporary disability benefits and all reasonable and necessary medical expenses. The claimant answered the appeal, contesting the hearing officer's finding that the defendants were not arbitrary and capricious in refusing to pay workers' compensation benefits.
Acy Jackson worked for Contract Labor, Inc., as a cement truck driver from June 8, 1988 until June 20, 1995. Testimony elicited at the hearing indicated that he was a very good employee. Jackson testified that, in January of 1995, he hurt his shoulders while delivering a load of concrete to a job site at a Uniroyal facility. He testified that the job *1180 site was muddy and, due to the muddy conditions, the cement truck he was driving had to be pulled into proper position by a bulldozer. While the truck was pulled backwards, the steering wheel jerked back and forth. As Jackson tried to hold the steering wheel straight, he felt a tingling in his arms. He continued to work that day and every day until his surgery. He first told his employer that he was injured on the job after he had the surgery.
After hearing all of the testimony and reading the exhibits, the hearing officer ruled in favor of Jackson, although she did state in her reasons that there was a very legitimate conflict between the claimant and the defendants. On appeal, the defendants argue that the hearing officer erred in determining that Jackson was involved in a work-related "accident."
LSA-R.S. 23:1031 requires a workers' compensation claimant to initially establish "personal injury by accident arising out of and in the course of his employment." Bruno v. Harbert International, Inc., 593 So.2d 357, 360 (La.1992). An accident, for purposes of workers' compensation law, is defined in LSA-R.S. 23:1021(1) as follows:
"Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
In order for a claimant to be entitled to recover workers' compensation benefits, he must establish by a preponderance of evidence that an accident occurred on the job site and that an injury was sustained. Garner v. Sheats & Frazier, 95-39 (La.App. 3 Cir. 7/5/95); 663 So.2d 57. A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. Garner, 663 So.2d at 60. The evidence is to be viewed in a light most favorable to the claimant. When there is proof of an accident and of a following disability, without an intervening cause, it is presumed that the accident caused the disability. Additionally, the trier of fact's determination as to whether a compensable injury was suffered is a question of fact and will not be disturbed unless manifestly erroneous or clearly wrong. Dew v. V.I.S., Inc., 95-141 (La.App. 3 Cir. 11/2/95); 664 So.2d 693.
The manifest error test requires the reviewing court to consider the record as a whole to ascertain whether the trier of fact's findings constituted manifest error. Since the trier of fact's findings are accorded great weight on appeal, the Louisiana Supreme Court has set forth a two-part test for use by appellate courts in applying the manifest error standard of review. First, the appellate court must conclude from the record that a reasonable factual basis does not exist for the trier of fact's findings. Second, the appellate court must determine that the findings were clearly wrong based on the record. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993).
In the instant case, the record clearly reflects that Jackson saw a doctor for shoulder pain as early as 1990. In December of 1994, he saw Dr. Louis F. Hargus for shoulder pain. Early in January of 1995, he saw Dr. Hector Mena for shoulder pain and received cortisone shots. Subsequent to the date of the accident, Dr. Mena ordered a MRI which indicated Jackson suffered from a torn right rotator cuff. Dr. Mena then referred Jackson to Dr. William F. Hagemann.
Dr. Hagemann testified in his deposition that he first saw Jackson on March 1, 1995. On that date, Jackson told him that the pain started four months earlier, which would have been in November, two full months prior to the date Jackson states the accident occurred. Further, Dr. Hagemann testified that Jackson described a sort of slow, gradual onset of these problems. At no time did Jackson refer to any one particular incident that he was aware of that may have caused his problems. Additionally, on the questionnaire from Dr. Hagemann, Jackson stated that this was not a job-related injury.
*1181 Although he could not determine how long the condition had existed, Dr. Hagemann testified that while operating on Jackson he observed that it definitely looked chronic. He also stated that Jackson had some arthritis of his acromioclavicular joint which caused some spurring that impinged on the rotator cuff. Dr. Hagemann referred to Jackson's condition as rotator cuff disease, a condition that is usually degenerative. However, he stated that something can happen to aggravate rotator cuff disease; he stated that the injury could have transpired the way Jackson described it.
Based on Dr. Hagemann's testimony, the appellants aver that the claimant suffered from a gradual deterioration or progressive degeneration and, therefore, the terms of the definition of accident are not met. Furthermore, the appellants aver that the claimant was not symptom-free prior to the incident in question.
The hearing officer found that Jackson did have a pre-existing condition that was aggravated by the accident and accelerated by the accident to the point where it actually caused the rotator cuff to tear. She determined, based on the testimony of Jackson and of Dr. Hagemann, that although the rotator cuff had deteriorated a great deal this particular incident probably pushed it over the brink and caused it to become symptomatic. Based on a complete review of the record, we cannot say that this finding was manifestly erroneous.
In the instant case, the claimant testified as follows:
Q. NOW, DID YOU GET HURT ON THE JOB WHILE YOU WERE WORKING FOR CONTRACT LABOR?
A. WELL, I THOUGHT I DID. I MEAN, THAT'S WHEN I REALLY FELT MY PAINS WHEN I WAS DRIVING THE TRUCK. THAT'S WHEN IT REALLY HIT ME.
Q. AND DO YOU KNOW WHAT PARTICULAR DAY THAT WAS?
A. I DON'T KNOW EXACTLY WHAT DATE, BUT I KNOW IT WAS DURING THE MIDDLE PART OF JANUARY OR SOMETHING LIKE AROUND THE 15TH, 16TH, 17TH, 18TH, OR 19TH, SOMEWHERE UP IN THAT AREA.
Q. OF WHAT YEAR?
A. `95.
Q. AND WHERE WAS IT THAT THIS ACCIDENT OCCURRED?
A. WHEN IT FIRST OCCURRED, I WAS AT UNIROYAL POURING FOR PAYNE & KELLER.
Q. ABOUT WHAT TIME OF DAY?
A. I THINK IT WAS SOMEWHERE AROUND ELEVEN, BETWEEN ELEVEN AND ONE O'CLOCK.
Q. WAS IT YOUR FIRST OR YOUR SECOND OR YOUR THIRD TRIP?
A. THAT WAS MY FIRST LOAD, BECAUSE THE WEATHER HAD BEEN BAD. IT HAD BEEN RAINING. I DON'T THINK IT WAS RAINING THAT DAY, BUT THE WEATHER HAD BEEN BAD. THEY HAD US LIKE ON A STANDBY, AND MOST OF THE OTHER GUYS, YOU KNOW, WHEN THEY WERE ON STANDBY, THEY WOULD LIKE TO GET OFF AND GO HOME, AND I WOULD MOST LIKELY BE THE ONE THAT KIND OF WAIT AND CATCH THE LOAD, YOU KNOW.
Q. WERE YOU BY YOURSELF?
A. NO. THEY HAD ANOTHER GUY THAT WORKED THAT DAY, TOO, BUT HE DIDN'T GO ON THE JOB WITH ME. HE HAD TO WAIT UNTIL I WOULD CALL BACK IN AND ORDER ANOTHER LOAD.
Q. SO, WERE YOU AT THE UNIROYAL PLANT IN YOUR TRUCK BY YOURSELF?
A. YES, SIR.
Q. AND WHAT HAPPENED TO YOU?
A. IT WAS MUDDY, AND YOU COULDN'T GET IN. I HAD BACKED IN ONCE; AND WHEN I GOT IN THE MUD, I COULDN'T GO ANY FARTHER, SO I HAD TO PULL BACK OUT AND TIE THE BULLDOZER ON TO IT AN PULL IT ON BACK IN. I WAS WATCHING THE FOREMAN, BECAUSE THEY WOULD GET UPSET IF YOU BACKED OVER THEIR FORMS, ESPECIALLY THOSE PLANTS.

*1182 I WAS WATCHING THE FOREMAN, AND THE TRUCK HAD VEERED OUT OF THE SPOT THAT I WAS SUPPOSED TO GO IN, AND I HAD TO TRY TO HOLD THE WHEEL AS MUCH AS I COULD. I HOLD ITHAD IT ONE WAY AND HOLD IT, BUT THE GUY ON THE BULLDOZER, HE KEPT GOING ON BACK, YOU KNOW. THEY STARTED HOLLERING, "HOLD IT. HOLD IT." I WAS STILL TRYING TO HOLD THAT STEERING WHEEL. THAT IS WHEN I FELT IT IN THE ARM, THE TINGLING IN THE ARM.
Q. YOU'RE DOING YOUR SHOULDER LIKE THIS, LIKE YOU'RE SHRUGGING YOUR SHOULDERS. IS THAT WHAT HAPPENED? THAT'S WHERE THE PAIN HIT YOU?
A. RIGHT. THAT'S WHAT IT DID WHEN IT HIT ME.
Q. DID IT HIT BOTH SHOULDERS AT THE SAME TIME?
A. BOTH SHOULDERS. I WAS HOLDING THE WHEEL. I HAD TURN IT ALL THE WAY FOR IT TO GO OVER, AND I WAS HOLDING IT. I WAS HOLDING IT AND HOLDING MY BRAKES, TOO.
Q. YOU HAD YOUR FEET ON THE BRAKES?
A. YES. I WAS TRYING TO HOLD IT.
Q. DESCRIBE THE PAIN THAT YOU HAD IN YOUR ARMS OR YOUR SHOULDERS.
A. WELL, IT WAS SOMETHING LIKE SOMEBODY TAKE TWO NEEDLES AND JUST JAB YOU IN THE BACK.
Q. DID YOU EVER HAVE THAT PAIN BEFORE?
A. NO, NOT THAT.
Dr. Hagemann testified as follows:
Q. Based on the treatment that you rendered, the history that was given to you, et cetera, can you tell us if it's your opinion as to whether or not these two injuries were work-related, meaning, for instance, the information he gave you from the driving, the wheel, on the rough surface was the cause of these injuries and the problems that he had, or was it something else that may have just developed; can you tell us that?
A. Well, I think that it's unlikely that the whole problem can be ascribed to an on-the-job type of injury. I think that this problem is multi-factorial because I don't think you're going to get this kind of rupture through a normal tendon even though the patient is going to say, "Well, my shoulder has never hurt me before. I never had any problem with my shoulder."
And that's certainly possible, but I think that, if you were able to have done an MRI scan on him a year ago, you might have seen some thinning of his rotator cuff, and it might have not been normal, and he had that Type II acromion process, and he had some arthritis of his acromioclavicular joint which causes some spurring which comes down and also impinges on the rotator cuff.
So there's some anatomical factors that can cause some wearing, and then, yes, I mean, overhead work, heavy work, going back and forth with the arms, certainly could kind of deliver that last blow and cause him to be symptomatic, and they can be symptomatic. Either they could rupture or they might not have even ruptured. I mean, it could have just caused a painful bursitis or tendinitis kind of problem.
....
Q. The history that he gave to you, that he had had no problems at all with his shoulders before several months before he saw you
A. Yes.
Q. and the examinations that you made and the testing that was done and the diagnosis that you came to, and the surgeries that were performed, those were things that were consistent with what he had told you about himself?
MR. SOILEAU:
Same objection.
BY THE WITNESS:
A. I think so.
BY MR. BREWER:

*1183 Q. And that is to say that he was asymptomatic before the incidents of the truck driving several months before he saw you, and then the trauma that he now relates that he believes was the cause of his problem and becoming symptomatic after that, that's also a usual routine for a fellow in this situation, isn't it?
A. It's possible that it could have transpired that way.
Q. Did you believe Mr. Jackson when he told you all these thing, the things that you've related that he told you today?
A. Sure. He's a nice fellow. I've enjoyed having him as a patient.
As stated previously, the Stobart case mandates that, to reverse under the manifest error standard of review, an appellate court must find, first, that a reasonable factual basis does not exist for the trier of fact's findings and, second, that the findings were clearly wrong. In the instant case, we find that Jackson did suffer from a preexisting condition and the incident at the Uniroyal facility made that condition symptomatic and was the final blow to his already weakened rotator cuffs. Therefore, the hearing officer's findings were not clearly wrong.
While it is true that Dr. Hagemann described the torn rotator cuff as a degenerative disease, the mere presence of a gradual or deteriorating condition does not preclude a claimant from recovering workers' compensation benefits. In Dyson v. State Employees Group Benefits Program, 610 So.2d 953 (La.App. 1 Cir.1992), we interpreted LSA-R.S. 23:1021(1) as amended and concluded:
[A]n otherwise healthy employee with a pre-existing condition is entitled to benefits if she can prove that her work contributed to, aggravated, or accelerated her injury. This is still the meaning of the last clause of section 1021(1), which requires that an injured employee be able to identify the event marking the time when one can identify an injury.
We further admonished our courts against following cases which suggested that the amended Section 1021(1) was meant to exclude from coverage persons who are worn down by their work rather then immediately crippled by it, as such a view is inconsistent with the purpose of the workers' compensation scheme. Dyson, 610 So.2d at 956. The Third Circuit has recently expounded even further in interpreting the amendments to Section 1021(1):
We must add our voices to those before us regarding the interpretation of "which is more than a gradual deterioration or progressive degeneration." Surely this phrase does not relate to an injury which is clearly spurred by work activity ... but only to non-work related activities. For to interpret it otherwise, would lead to an absurd result as it would negate the very purpose for which the Worker's Compensation Act was instituted; namely, to provide relief to employees whose work has caused them injury and the inability to work.
Guilbeaux v. Martin Mills, Inc., 93-1359, p. 5 (La.App. 3 Cir. 5/4/94); 640 So.2d 472, 475, writ denied, 94-1444 (La. 9/23/94); 642 So.2d 1291.
Therefore, we find no merit to the contention that Jackson is excluded from coverage on the basis that his injury was a gradual progression of a pre-existing condition. The record contains evidence identifying the event which constitutes an accident, namely, the attempt to hold the steering wheel of the cement truck while a bulldozer pulled it backwards.
The appellants next assert that the claimant did not provide notice pursuant to LSA-R.S. 23:1301. Delay in giving notice of injury shall not be a bar to recovery if it is shown that the employer has not been prejudiced by such a delay. LSA-R.S. 23:1305; Holcomb v. Bossier City Police Dept., 27,095 (La.App. 2 Cir. 8/25/95); 660 So.2d 199; Loyd v. IMC Fertilizer, Inc., 557 So.2d 1078 (La.App. 2 Cir.1990), writ denied, 561 So.2d 102 (La.1990). The appellants have failed to establish prejudice from the untimely notice. Furthermore, the hearing officer found that Jackson had not been properly informed of his rights regarding workers' compensation benefits and that was the cause of the delay in notification. Also, the fact that Jackson delayed in informing his employer of the accident is understandable in the instant *1184 case. He had suffered shoulder pain in the past. On the day of the accident, with the onset of the pain in his shoulders he assumed it would go away as it had in the past; however, it did not. Jackson testified that he thought the pain was caused by bursitis. In Mackie v. Crown Zellerbach Corp., 444 So.2d 166 (La.App. 1 Cir.1983), this court stated:
We will simply add that a potential worker's compensation claimant should not be barred from recovery because he does not realize or diagnose the full extent of his injury immediately after its occurrence.
Finally, the appellee asserts that the appellants were arbitrary in refusing to pay benefits. We disagree. An assessment of penalties for nonpayment of workers' compensation benefits is proper unless the nonpayment results from conditions over which the employer or insurer have no control or unless the employee's right to such benefits has been reasonably controverted. Lacava v. Albano Cleaners, 94-1586 (La.App. 1 Cir. 4/7/95); 653 So.2d 834, aff'd award of penalties and attorney's fees reinstated, 95-1141 (La. 6/27/95); 656 So.2d 990. LSA-R.S. 23:1201.2 provides for the assessment of attorney's fees against an insurer who arbitrarily, capriciously, or without probable cause has refused to timely pay workers' compensation benefits. A claimant is not entitled to an award of penalties or attorney's fees where a rational basis exists for the refusal to pay. Lacava, 653 at page 838. We find in the instant case there was a rational basis for the appellants' refusal to pay this claim.
For the foregoing reasons, we affirm the judgment of the hearing officer. All costs of this appeal are assessed against the appellants.
AFFIRMED.