754 So.2d 1024 (1999)
Lillie SANDERS
v.
GRACE NURSING HOME.
No. 98 CA 1344.
Court of Appeal of Louisiana, First Circuit.
September 24, 1999.
Writ Denied January 7, 2000.
J. Arthur Smith, III, Baton Rouge, for Plaintiff-Appellee.
John J. Rabalais, Covington, for Defendant-Appellant.
Before: SHORTESS, PARRO, and KUHN, JJ.
SHORTESS, J.
Lillie Sanders (plaintiff) was employed by Grace Nursing Home (defendant) as a Nurse's Aide Helper. She was employed with Grace Nursing Home for over twelve years. On Friday, July 7, 1995, plaintiff completed her work shift (a 5:45 a.m. to 2:00 p.m. shift) and went home. She did not experience any pain on that day at work or at home, or the following two days (Saturday and Sunday) while she was off work. However, Sunday night she began experiencing pain in her back. On Monday morning, July 10, 1995, plaintiff again experienced back pain. She called work *1025 and informed her employer of her intent to be absent in order to visit the doctor regarding her back pain. Plaintiff did not mention the pain was work-related. In fact, plaintiff never filed an accident report with her employer or notified her employer of any specific work-related incident. Plaintiff's doctor excused her from work for the next week and prescribed medication and two days of therapy for her back pain. Plaintiff continued under her doctor's care through June 26, 1996, when she was referred to a neurosurgeon. On July 8, 1996, plaintiff filed a disputed claim for compensation contending that she was "changing mattresses on [a] patient['s] bed and in the course of doing so injured her back." A hearing was held, and the workers' compensation court (WCC) found plaintiff "injured herself in the course and scope of her employment on or about July 7th, 1995." The WCC further found her disabled through February 26, 1996, and ordered defendant to pay plaintiff weekly indemnity benefits for temporary total disability from July 7, 1995, to February 26, 1996, at the compensation rate of $127.00 per week, together with legal interest. It ordered defendant to pay plaintiff supplemental earnings benefits from February 26, 1996, through the date of the trial[1] at the compensation rate of $127.00 per week, together with legal interest. The WCC went on to order that plaintiff was entitled to be treated by an orthopedist of her own choosing. Finally, the WCC dismissed plaintiff's claim for penalties and attorney fees and defendant's claims. Defendant appeals.
Defendant contends the WCC erred in finding that 1) plaintiff sustained an accident arising out of and in the course and scope of her employment, 2) plaintiff was uneducated and suffered from eyesight problems, both of which prevented her from reporting a work incident or connecting her back pain to her employment, 3) there was medical causation between plaintiff's back pain and her employment, 4) there was medical causation for plaintiff's back painby relying on the medical opinion of a physician whose testimony is not contained in the record, and 5) plaintiff did not violate Section 1208 of the Louisiana Workers' Compensation Act so as to forfeit any benefits to which she may have otherwise been entitled under the Act.
Defendant contends plaintiff did not sustain an "accident" at the work place and that she did not report an "incident, accident, event or trauma while working at [Grace Nursing Home]." Defendant further maintains that the only incident or event plaintiff identified was the onset of back pain when she attempted to get out of bed at home on the morning of July 10, 1995. It also maintains she did not experience any pain at work on July 7, 1995, or the next two days while she was off, and that plaintiff did not relate the event necessary to prove she sustained an "accident" as defined by the Workers' Compensation Act entitling her to benefits.
The main issue before the court is whether plaintiff suffered an "accident" as defined under the Louisiana Workers' Compensation Act. In order to be compensable under the workers' compensation laws, an injury must have resulted from an "accident arising out of and in the course of [an employee's] employment."[2] An "accident" is defined by Louisiana Revised Statute 23:1021(1):
an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
In Jackson v. Savant Insurance Company,[3] we stated:

*1026 In order for a claimant to be entitled to recover workers' compensation benefits, he must establish by a preponderance of evidence that an accident occurred on the job site and that an injury was sustained. A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. The evidence is to be viewed in a light most favorable to the claimant. When there is proof of an accident and of a following disability, without an intervening cause, it is presumed that the accident caused the disability. Additionally, the trier of fact's determination as to whether a compensable injury was suffered is a question of fact and will not be disturbed unless manifestly erroneous or clearly wrong.
(Citations omitted.)
Both plaintiff and defendant cite cases we have previously reviewed determining whether an incident is an "accident" as defined by the above statute. In many of the cases the plaintiff had a pre-existing condition that over a gradual progression became aggravated. In Robin v. Schwegmann Giant Supermarkets, Inc.,[4] the plaintiff worked as a deli supervisor and had lifting duties, which resulted in back pain. The plaintiff testified she experienced pain throughout the time during which the deli area was understaffed; however, she stated the pain she experienced at work on the day of her injury was different from the previous pain and was more intense. The plaintiff's testimony was consistent with her doctor's testimony that she was subjected to continuous micro-trauma in the performance of her duties, which aggravated her pre-existing condition. We found, under those circumstances, that the incident that caused the plaintiff's condition was the lifting on the day she was injured. In Dyson v. State Employees Group Benefits Program,[5] the plaintiff was employed as an examiner, which was a sedentary position. When she became a clerk, she was required to stand most of the day, and she began having pain in her feet. The plaintiff had flat feet, which her physician testified made her more prone to foot problems caused by prolonged standing. On the day of her injury, the plaintiff was at work attempting to pick up a bundle of copies when she pivoted to turn and felt a sharp pain shoot through her feet. She was diagnosed with plantar fasciitis, an inflammation in the heel area. We stated in that case that "section 1021(1) ... requires that an injured employee be able to identify the event marking the time when one can identify an injury,"[6] and we found that the plaintiff did identify that event on the day when she pivoted and felt the pain.
In the above cases, each plaintiff was able to identify an incident at work that caused the injury. While each of the injuries was caused by repetitive movements (such as lifting or prolonged standing) done over time, each plaintiff could cite a particular incident where the pain changed or became different and was identified at work.
In this case, plaintiff testified she went to work on July 7, 1995, and completed her shift without experiencing any pain. She went on to discuss the onset of her pain that weekend:
Q. Now, were you injured on July 7th, 1995?

*1027 A. Yes, sir. I didn't feel any pains when I left work, when I got off, and all the way to go home, I didn't have any pains. I had my daughters at home to do the work at the house. So, I just sat around the house. When I got up that Sunday night, I kind of feeling pains in my back. When I got up Monday morning to come to work, I got up beside the bed, stand up, and sat back down because I couldn't go no further.
Q. We'll go into that in more detail. But, let me ask you this: Do you know how you were injured?
A. It was on the job because I didn't have any other job to go on after I left there.
. . . .
Q. Ms. Sanders, tell us how you know, if you do, that this is when you injured your back.
A. Because I didn't have no pains or nothing. I know that's where I hurt it at. I left work, I didn't feel anything. Come that Sunday night, my back was kind of hurting and I was wondering why I was hurting. That Monday morning, I got up to go to work, that's when I couldn't stand up.
I called in and I told them to tell Shirley Brown that I wouldn't be able to come in to work that morning because my back was hurting and I couldn't stand up. I would have to go to the doctor.
Plaintiff did not experience any kind of pain at work or for the next two days. She contends she did not do any work over the weekend, so the injury must have been caused by something she did at work. This contention is completely different from the cases cited above. In those cases, each plaintiff not only began to experience pain at work, but the pain manifested during the performance of some duty at work. While the court recognizes that certain injuries do not always manifest themselves immediately, plaintiff's contention that her onset of back pain was work-related because she had not been active during her time off from work, does not overcome the burden of proving that "(1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident."[7] Plaintiff had a history of back pain, which could have progressed on its own to cause her pain Sunday night and Monday morning.
In addition, Dr. Richard Rathbone (plaintiffs physician) testified by deposition. He diagnosed plaintiff on July 10, 1995 (the Monday morning she called in to work), with lower extremity sciatica (pain radiating from the back into the buttock and into the lower extremity along its posterior or lateral aspect, most commonly caused by prolapse of the intervertebral disk). However, Rathbone examined plaintiff on May 31, 1995 (before the incident), and she had the same diagnosis, lower extremity sciatica:
Q. Okay, Doctor, I believe we were talking about your July 10th, 1995 visit with Lillie Sanders.
. . . .
Q: What was your diagnosis?
A. Well, basically that she had somebasically the same thing she had on 5/31/95. Theit was radiating down her leg down to her lowerleft lower extremity; hurting on her left side.[8]
Rathbone also testified plaintiff never informed him that her back pain was work-related. Dr. John Piker (plaintiffs other physician) also testified by deposition. He stated he had been treating plaintiff for back pain since 1993. He diagnosed plaintiff at that time with osteoarthritis (arthritis *1028 of the aging, breakdown of bone and joints) because usually she experienced pain and stiffness in the morning that decreased throughout the day. Therefore, the testimony of the doctors further shows plaintiff's back pain more than likely was not related to a single incident, but more to a back injury that degenerated over time. Plaintiff had a history of early morning back pain, and she was diagnosed with the same condition on May 31, 1995, as on Monday, July 10, 1995.
The WCC stated its decision was based on the fact that plaintiff only had an eighth-grade education, was educated in a rural area, and could not understand certain things. The WCC also based its decision upon the fact that plaintiff had an eyesight problem and could not properly see forms. The court went on to state:
I don't think this lady is going to understand when somebody asks her if she had a trauma. I'm not sure she would even understand if somebody asked her if she had an accident or injury. That is not what she has described to me today. She has not described to me today an accident or an actual injury in terms of something that happened at the time. What she has described to me today is that on her last day of work, in doing her regular work, she went home and within forty-eight hours developed disabling back pain. Different, in her mind, from the back pain that she had discussed with Dr. Rathbone approximately six weeks earlier, and in terms of treatment from that date, obviously, different.
. . . .
I'm convinced, based upon her testimony and the medical evidence, that she did sustain a herniated disc on July 7th, 1995. Although Dr. Piker discussed his feeling[s] that she should have felt some immediate pain with a traumatic herniated disc, it has been my experience from orthopedic surgeons, including Dr. Randy Lea, who I use as an IME physician, on most occasions this is not always the case. I have had many, many cases where the doctors, especially orthopedic surgeons, have confirmed to me that it is not always a sudden onset, that it can creep up on someone.
We find the WCC was manifestly erroneous in finding plaintiff injured herself in the course and scope of her employment on July 7, 1995. While plaintiffs lack of education may have inhibited her from understanding that she needed to inform her supervisor at work of a specific incident related to her back injury, as well as the doctors who treated her, the record reveals the onset of plaintiffs pain is totally different from the cases cited above. Plaintiff did establish she has a back problem; however, based upon the record and the above reasons, she has not proven this pain was related to a work-related "accident" as defined by the relevant statute and the jurisprudence of this state.

CONCLUSION
For the foregoing reasons, we find the WCC was manifestly erroneous in finding plaintiff injured herself in the course and scope of her employment, and we hereby reverse. Costs of appeal are assessed to plaintiff.
REVERSED AND RENDERED.
NOTES
[1] Defendant was ordered to pay benefits after the date of the trial in accordance with the Workers' Compensation Act.
[2] La. R.S. 23:1031(A).
[3] 96-1424, p. 3 (La.App. 1st Cir.5/9/97), 694 So.2d 1178, 1180.
[4] 93-2310 (La.App. 1st Cir.11/10/94), 646 So.2d 1030, writ denied, 95-0202 (La.4/21/95), 653 So.2d 554.
[5] 610 So.2d 953 (La.App. 1st Cir.1992).
[6] Dyson, 610 So.2d at 955.
[7] Jackson, 96-1424 at 4, 694 So.2d at 1180.
[8] Rathbone stated that on May 31 plaintiff tested with a positive straight leg raise (the test used to diagnose sciatica), but on July 10, she tested with a negative straight leg raise. However, Rathbone explained that the negative leg raise was not unusual with sciatica.